IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

STEVEN SCOTT ROGERS, *by his guardian,*
*Tracy Rogers*, TRACY ROGERS, SAMBA HEALTH
BENEFIT PLAN, BLUE CROSS BLUE SHIELD
OF WISONSIN, and STATE OF WISCONSIN
DEPARTMENT OF HEALTH SERVICES

                    Plaintiffs,

        v.

K2 SPORTS, LLC, LEXINGTON INSURANCE
COMPANY, and AIG EUROPE LIMITED,

                    Defendants.

OPINION & ORDER

17-cv-534-jdp

Plaintiff Steven Scott Rogers fell while skiing and suffered a serious brain injury. Scott and his wife, plaintiff Tracy Rogers, contend that Scott's helmet, made by defendant K2 Sports, was defectively designed and that the defect was a cause of his injury. They have sued K2 for negligence, strict product liability, and breach of warranty. Dkt. 32. Tracy also claims loss of consortium as a result of her husband's injuries.[1] K2 denies that the helmet was defective, contending instead that the helmet was the wrong size and that Scott had not properly fastened it, and that he was injured by direct contact with the ground.

---

[1] Plaintiffs Samba Health Benefit Plan, Blue Cross Blue Shield of Wisconsin, and State of Wisconsin Department of Health Services all paid for Scott's medical treatment and claim to be subrogated to Scott's rights. Dkt. 1-1, ¶¶ 5–6; Dkt. 43, ¶ 3. The parties have stipulated to the dismissal of defendants Lexington Insurance Company and AIG Europe Limited. Dkt. 250.

K2 moves for summary judgment on all of plaintiffs' claims. Dkt. 102. Plaintiffs oppose, and they move to strike defendant's experts' opinions that the helmet moved out of position when Scott fell. Dkt. 139.

At the heart of this case is a straightforward dispute about the role of the helmet in Scott's injury. The court will limit the testimony of K2's experts about how the injury occurred because some of those opinions are too speculative. But that still leaves genuine disputes about the fit of the helmet and whether it was properly designed, so K2's motion for summary judgment will be denied.

## UNDISPUTED FACTS

The following facts are undisputed except where noted.

Scott wore a K2 Phase 08 helmet while skiing with his stepson Coby at the Afton Alps Ski Area in Washington County, Minnesota, on New Year's Eve 2015. Around 8:40 p.m., Scott and Coby skied down a beginner's run called Nancy's Nursery. Scott fell about halfway down the hill near some small mounds called "rollers." Coby was in front of Scott and did not witness the fall. Another skier did witness the fall, but he was not able to recall any details about it, except that the fall did not seem unusual.

The fall left Scott unconscious and bleeding from his left ear. Scott was taken by ambulance to a hospital, where doctors conducted tests including a CT scan of Scott's head. The accident caused brain hemorrhages and fractured Scott's skull, left clavicle, and numerous ribs along Scott's left side. As a result of permanent brain damage caused by the accident, Scott now lives at a VA hospital where he receives round-the-clock care.

The K2 helmet was certified as compliant with the standards of ASTM International, which is an organization that develops and publishes technical standards for a wide range of products.[2] Compliance with ASTM standards is voluntary. The K2 helmet has three layers. The exterior layer is a hard-plastic shell. The shell is lined with an Expanded Polystyrene (EPS) energy-attenuating layer, which is supposed to absorb and dissipate shock from a blow to the head. The third layer is a comfort liner that can be adjusted to fit on the user's head. After Scott's accident, the lower left rear of the exterior shell was cracked. And, in the same area, the shock-absorbing EPS layer was flattened, and chunks of the EPS were missing.

The parties sharply dispute what happened to the helmet when Scott fell. K2 contends that the helmet was improperly fit and not properly fastened. K2's theory is that as Scott fell, his helmet shifted out of place and the left posterior region of his head was exposed and directly hit the ground. Dkt. 144, ¶ 38. K2 contends that the helmet only partially protected Scott's head, and that the point of impact on the helmet was below the "test line," which is the lower limit of the area that is supposed to be protected under ASTM standards. K2 also contends that pictures from the day of the accident show that Scott failed to tighten the helmet's chinstrap. *Id.*, ¶ 39.

Plaintiffs contend that the helmet did not actually meet ASTM standards. Plaintiffs' theory is that the bottom rear of the helmet was excessively tapered at the test line. As a result of the tapering, the helmet did not afford sufficient protection against a blow such as the one Scott suffered. Plaintiffs also contend that the helmet was the right size for Scott.

---

[2] *See Detailed Overview*, ASTM International, www.astm.org/ABOUT/full_overview.html

ANALYSIS

K2 moves for summary judgment on the grounds that plaintiffs cannot prove that Scott's K2 helmet was defective or that it caused Scott's injuries. In connection with their opposition to K2's motion, plaintiffs move to strike parts of K2's expert evidence. The court begins with plaintiffs' challenge to the expert evidence.

## A. Plaintiffs' motion to exclude expert evidence

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999), the court must serve as a gatekeeper to ensure that proffered expert testimony meets the requirements of Federal Rule of Evidence 702. Essentially, the gatekeeping function consists of a three-part test: the court must ensure that the expert is qualified, that the expert's opinions are based on reliable methods and reasoning, and that the expert's opinions will assist the jury in deciding a relevant issue. *Myers v. Ill. Cent. R. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). The proponent of expert evidence bears the burden of establishing that the expert's testimony is admissible. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Plaintiffs move to strike aspects of the expert reports of P. David Halstead and Irving Scher. Although plaintiffs dispute Halstead's qualifications, the main question is whether Halstead and Scher used reliable methodologies and reasoning. The admissibility inquiry undertaken by the court "must be 'tied to the facts' of a particular case." *Kumho*, 526 U.S. at at 150 (quoting *Daubert*, 509 U.S. at 591). The "critical inquiry" for admissibility is whether the opinion is rationally connected to the underlying data or "connected to the existing data 'only by the *ipse dixit* of the expert.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781

(7th Cir. 2017). Expert testimony that merely asserts a "bottom line" or provides testimony based on subjective belief or speculation is inadmissible. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010).

### 1. P. David Halstead

P. David Halstead is the Technical Director of Southern Impact Research Center. Halstead conducted a series of drop tests to try to replicate the damage on Scott's helmet, and thereby to determine the amount of force that the helmet and Scott experienced at the time of Scott's fall. Dkt. 110, at 6. Halstead offers two main opinions: (1) that the helmet was not defective, and (2) that the helmet was out of place at the time of the accident. Plaintiffs move to strike three aspects of Halstead's report. Dkt. 137, at 6–7.

First, plaintiffs move to strike Halstead's opinion that the helmet was out of position at the time of the accident. Halstead expresses that opinion in various forms:

- "It is my opinion that Mr. Rogers' injuries were caused by complex fall kinematics that resulted while his helmet was out of position (rotated slightly to the left and possibly higher on the right) exposing his temporal bone in the area he sustained the mastoid fracture." Dkt. 110, at 7.

- "Mr. Rogers sustained his injuries when his partially helmeted head, with the mastoid area of the temporal bone exposed, made contact with a somewhat compliant surface such as snow substantially similar to the snow measured at Afton Alps." *Id*. at 9.

- "The skull fracture is a result of functionally direct contact with the impact surface to the mastoid area." *Id*.

- "Given the test results had the helmet been in position the skull fracture almost certainly would not have occurred." *Id.*

The court agrees with plaintiff that Halstead has not shown that this opinion is rationally connected to underlying data.

Halstead conducted a series of drop tests using K2 Phase 08 helmets, the same model as Scott's helmet. *Id.* at 6. Under the ASTM standards, a helmet must keep the user's head from accelerating more than 300 g, meaning that the force of impact on the skull is equivalent to 300 times the force of gravity or less. Dkt. 124-13, at 3. Although these drop tests were not testing for ASTM compliance, Halstead used 300 g as a threshold for the helmet's effectiveness. Halstead conducted eleven tests by dropping helmets on to a modular elastomer programmer (MEP), a rubber pad that is somewhat harder than packed snow. Dkt. 110, at 6. None of the drops resulted in an acceleration of more than 181 g or damaged the helmet in a way that resembled the damage to Scott's helmet. So Halstead conducted three more tests using a harder, steel anvil. *Id.* at 6. One of these drops did crack the helmet, but the damage was still not as severe as Scott's helmet.

Halstead opined that because his tests could not replicate the damage to Scott's helmet, Scott's helmet must not have been in place on Scott's head at the time of the accident. *Id.* at 8–9. Halstead did not conduct any follow-up testing; he did not, for example, try dropping the helmet while it was out of place on the headform or try dropping the helmet without using a full-sized headform. Instead, Halstead scanned both the accident helmet and the most severely damaged test helmet with a laser. *Id.* After eyeballing the results of the laser scan, Halstead again concluded that the damage did not match and that therefore the helmet was not in place at the time of the accident. He opined specifically that the helmet rotated to the left, exposing the area where Scott's skull was fractured.

Two factors that a court may consider regarding the admissibility of expert testimony are whether the expert "unjustifiably extrapolated from an accepted premise to an unfounded conclusion" and whether "the expert has adequately accounted for obvious alternative

explanations." *Gopalratnam*, 877 F.3d at 788 (quoting *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534–35 (7th Cir. 2005)). Both factors support striking Halstead's opinion here. When Halstead's test results failed to re-create the damage to Scott's helmet, Halstead had a basis for concluding that Scott's fall was in some way atypical. But he had no foundation to then extrapolate from these results that the helmet was therefore out of position. And he was even less justified in hypothesizing on the helmet's exact orientation during the accident. Halstead did not confirm his hypothesis through additional testing, nor did he address alternative explanations for the damage to Scott's helmet, such as the existence of a manufacturing defect or a weakening of the helmet through multiple impacts. And his use of laser scanning provided no additional details to support his hypothesis. Halstead simply picked one possible explanation for the test results and then assumed it was true. Halstead concedes that he is not an expert in the "full body kinematics" that are critical to understanding how Scott was injured. Dkt. 110, at 7.

Second, plaintiffs move to strike Halstead's opinion regarding the speed and force of impact on Scott's head at the time of the accident:

> Based on biomechanical testing the likely impact speed of his head to the surface was 13–14 mph or higher, head accelerations were in the range of 170 g – 220 g with angular acceleration between 7000–8000 rad/sec[2].

Dkt. 110, at 7. The court will strike this opinion. Rule 702 places the responsibility on the expert to explain how his methodologies support his opinions. *Metavante*, 619 F.3d at 761. Although not explicitly stated, Halstead appears to have adopted these numbers from the results of his tests on the MEP pad. Dkt. 110, at 6. But as Halstead emphasized in his report, the tests on the MEP pad were unable to replicate Scott's accident. It is not clear why the

speeds and forces of impact must nonetheless be correct, and Halstead does not provide an explanation.

Third, plaintiffs move to strike Halstead's opinion regarding the helmet's ability to protect against high-speed impact:

> "As the biomechanical testing shows the helmet, at its thinnest, well below the test line is able to take an impact at nearly 14 miles per hour with a hemi anvil and still remain under 300g."

*Id*. at 7. The court will not strike this opinion, which is based on the test results. Plaintiffs suggest that Halstead is not qualified to provide "biomechanical engineering opinions," but in their reply brief, plaintiffs concede that Halstead is an experienced technician who is qualified to conduct the type of drop testing he performed. Dkt. 151, at 2.

The bottom line is that the court will consider Halstead's drop testing analysis, but it will not consider his testimony that the helmet was out of place at the time of the accident.

## 2. Irving Scher, Ph.D., P.E

Irving Scher is a biomechanical engineer at Guidance Engineering and Applied Research. Scher's report includes two separate sets of conclusions that are relevant to summary judgment. First, Scher used computer models to determine the fit and looseness of the helmet that Scott wore. Second, Scher conducted a biomechanical engineering analysis to determine the "kinematics" of the accident—the movement of Scott's body and ski equipment according to the laws of physics. Plaintiffs move to strike both sets of conclusions. Dkt. 137, at 7–8.

### a. Helmet fit

Scher opines that the helmet was poorly fit and that it was loose enough to move out of place:

> - "Mr. Roger's head circumference at the hat line is approximately 57 centimeters. Because the head size

8

recommended for the subject helmet ranges from 59 to 62, Mr. Rogers' head was at or below the lower end of the subject helmet's size." Dkt. 107, ¶¶ 10-12.

- "At the level of the helmet brim there was at least 2 to 4 centimeters of free space between Mr. Rogers' head and the helmet in the anterior-posterior direction, and the helmet had space to rotate 20 degrees clockwise and counter-clockwise." *Id.* ¶ 13.

- "The subject helmet was not snugly fitted to Mr. Rogers' head." *Id.* ¶ 14.

These opinions are rationally connected to the reasonably reliable data that Scher considered; the court will not strike them.

Scher created a 3D computer model of Scott's head from the CT scans on the night of Scott's accident. Dkt. 112, at 15. Using this model, Scher calculated circumference of Scott's head as 57 centimeters. Because the helmet that Scott purchased was recommended for head circumferences of 59 to 62 centimeters, Scher opined that Scott's helmet was one size too large. Scher scanned an exemplar K2 helmet of the same size as Scott's helmet. Within his computer modeling software, Scher placed the 3D model of the helmet on the 3D model of Scott's head. Scher determined that there was at least 2.25 centimeters of free space between Scott's head and the interior of the helmet, and that with this extra space the helmet could freely rotate 20 degrees clockwise and counterclockwise. Finally, Scher viewed photographs of Scott on the day of the accident and determined that Scott's chin strap was "loose." *Id.* at 16. Scher's analysis of the helmet's fit led Scher to conclude that it was possible for the helmet to move out of position and expose a portion of the posterior region of Scott's head.

Plaintiffs contend that Scher's analysis is unreliable because Scott's head actually has a circumference of 60 centimeters, not 57 centimeters. Plaintiffs' measurement comes from

Tracy's declaration that she measured Scott's head with a tape measure. Dkt. 123, ¶¶ 7–8.[3] Neither party adduces evidence showing that the other party's measurement is manifestly incorrect, so the size of Scott's head is a matter of genuine dispute.[4] Such a dispute does not render Scher's opinion inadmissible.

### b. Kinematics analysis

Scher also offered opinions about how Scott fell and how he was injured, which Scher refers to as a "kinematics" analysis. He expresses those opinions as follows:

- "Mr. Rogers likely caught his ski edge, fell forward and leftward while rotating clockwise and continuing downhill, and contacted the left, posterior region of his helmeted head on his acromioclavicular joint and proximal humerus, a very rigid area of hard-packed snow, or both." Dkt. 112, at 36.

- "Because the helmet was not snug on Mr. Rogers's head and he did not adjust appropriately the chin strap, the subject helmet was able to (and did) move out of position during Mr. Rogers's fall and subsequent head impact." *Id.*

- "No snowsport helmet would be able to prevent the injuries sustained by Mr. Rogers in the subject accident." *Id.*

- "The subject helmet rotated axially counterclockwise and rightwards on Mr. Rogers' head during his fall such that his helmet was out of place and exposed a portion of the left

---

[3] K2 objects that this is untimely and unreliable expert testimony. The evidence is vulnerable to impeachment, but it is not expert evidence. The court will allow plaintiffs to submit evidence of the size Rogers' head.

[4] Plaintiffs contend that Scher did not follow the K2 head-measurement instructions, but their argument is based solely on a flier that plaintiffs downloaded from a third-party website. *See* Dkt. 124, ¶ 58; Dkt. 124-19. Because plaintiffs have produced no evidence that this flier originated from K2, K2 objects that it is inadmissible under Federal Rule of Evidence 901. However, even if the flier were admissible, it does not affect the admissibility of Scher's testimony. According to plaintiffs, the flier shows that Scher should have measured Scott's head at a lower location. But the flier uses a cartoon drawing to show the correct position to measure the head circumference, and the cartoon is not clearly different from the position where Scher measured Scott's head. Tracy claims that she measured Scott's head in the same location as Scher. Dkt. 123, ¶¶ 7–8. Tracy does not claim she used this flier.

posterior region of his head just prior to impact." Dkt. 107, ¶ 9.

- "Mr. Rogers failed to properly tighten the subject helmet's chin strap, which allowed the subject helmet to move out of position as he fell." *Id.* ¶ 15.

- "Immediately before Mr. Rogers' head contacted the ground, the subject helmet moved out of position, causing the point of impact to be below the helmet's test line." *Id.* ¶ 18.

- "In my professional opinion, any snow sport helmet with a similar fit and loose chin strap on Mr. Rogers' head would have similarly moved relative to his head in the subject fall." *Id.* ¶ 20.

The court will not consider these opinions because they are too speculative: there is simply not enough information about how Scott fell to support this analysis.

Based on the assumption that "catching an edge" is a common occurrence among skiers, and the location and severity of Scott's injuries, Scher created a computer simulation using the computer program MADYMO. Scher ran several simulations in MADYMO, using different estimates for Scott's speed and the conditions on the ski slope. *Id.* at 29. He tweaked the variables in the simulation until he was able to create a simulation that could result in injuries similar to Scott's injuries. Then based on that simulation, he opined on Scott's body movements as he fell, and the forces that Scott experienced when he hit the ground. Scher opines both that Scott's helmet hit the ground below the test line, and that Scott hit the ground with such force that no helmet could have prevented Scott's injuries.

Scher's simulation, and the opinions based on it, are inadmissible because they are based on guesswork rather than the facts of Scott's accident. An expert must show that he has sufficient data to use the methodology employed. *See Gopalratnam*, 877 F.3d at 781 (Rule 702 requires the underlying data to be both qualitatively and quantitatively sufficient to conduct

the analysis). Opinions that are based on speculation are inadmissible. *Metavante*, 619 F.3d at 761. Here, there was no witness who could describe the moments leading up to the fall, no measurement or even estimate of Scott's speed at the time of the fall, and no reliable evidence of Scott's skiing abilities or style. The court will exclude the opinions expressed on pages 21 through 31 of Scher's report. Dkt. 112.

Scher is free to testify that the helmet was loose and that it might have moved out of position. And he can testify that based on Halstead's testing, and based on the literature regarding head injuries and ski accidents, it seems unlikely that a typical fall could have caused the injuries that occurred. But Scher cannot speculate that the helmet actually moved or opine on the exact location of the helmet at the time of impact.

## B. K2's motion for summary judgment

Plaintiffs bring claims under theories of strict product liability, negligence, breach of warranty, and loss of consortium. K2 moves for summary judgment on all of plaintiffs' claims. The court will grant summary judgment on only the breach of warranty claims, which plaintiffs waive. Genuine disputes of material fact preclude summary judgment on the other claims.

### 1. Summary judgment standard

Summary judgment is appropriate only if there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment will not be granted unless "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 970 (7th Cir. 2004) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

### 2. Strict Product liability claim

Wisconsin product liability law is codified under Wisconsin Statute § 895.047.[5] A product liability claim has five elements: (1) the product was defective; (2) the defect rendered the product unreasonably dangerous; (3) the defect existed when the product left the control of the manufacturer; (4) the product reached the consumer without substantial change; and (5) the defect caused the claimant's damages. Wis. Stat. § 895.047(1). K2 contends that they are entitled to summary judgment because plaintiffs cannot show that the helmet had a defect that rendered it unreasonably dangerous and because plaintiffs cannot show that the alleged defect caused Scott's injuries.

There are three different categories of defects under the statute: design defects, manufacturing defects, and warning defects. Plaintiffs concede that they do not have evidence of a manufacturing defect, but they bring alternative claims for defective design if the helmet was in place during the accident and defective warning if the helmet fell out of place before the impact. Under the first theory, plaintiffs must show that the helmet had a design defect that caused Scott's injuries to be worse than they would have been without the defect. Under the second theory, plaintiffs must show that the helmet's instructions did not warn users to tighten the chinstrap. K2 seeks summary judgment as to both theories.

---

[5] The Wisconsin Supreme Court has not stated whether preexisting common law still applies where consistent with the product liability statute. One federal court analyzed the legislative history and determined that it does. *Janusz v. Symmetry Med. Inc.*, 256 F. Supp. 3d 995, 1001 (E.D. Wis. 2017). Because both parties cite common law that predates the statute, and because there is no authority to the contrary, the court will assume that Wisconsin's common law still applies at least where it does not contradict the terms of the statute.

### a. Defective design

Defendants contend that plaintiffs cannot adduce evidence of a design defect and that, even if a defect exists, plaintiffs cannot show that it caused Scott's injuries. The court will address each element in turn.

### i. Unreasonably dangerous defect

Summary judgment is inappropriate when resolution of a claim requires the court to choose between opposing expert testimony. *See Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008) (explaining that "in a case of dueling experts . . . it is left to the trier of fact . . . to decide how to weigh the competing expert testimony"). That is the case here. Both parties hired experts to test K2 helmets according to ASTM standards, but the experts disagree on the testing procedures and achieved different results.[6]

Under Wisconsin's product liability statute, a product is defective in design if the "foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product not reasonably safe." Wis. Stat. § 895.047(1)(a).

K2 contends that plaintiffs have not shown any evidence of a design defect. But plaintiffs' expert, Mariusz Ziejewski, provides evidence sufficient to support a reasonable jury verdict that a foreseeable risk of harm could have been reduced by the adoption of a reasonable alternative design. Ziejewski's report states that due to tapering at the edge, the K2 helmet does not provide the protection required by ASTM standards when struck in the lower back. Dkt. 116; Dkt. 124-7. Ziejewski further states that other helmets without this tapering do

---

[6] K2's expert, Halstead, conducted ASTM testing in addition to the tests at issue in plaintiffs' motion to strike. Dkt. 110, at 5. Plaintiffs do not move to strike Halstead's ASTM test results.

provide the protection required by ASTM. This makes the K2 helmet more dangerous than helmets from K2's competitors.

K2 argues that Ziejewski's report is insufficient to establish a design defect because the report does not specifically opine that the design of the K2 helmet rendered it "not reasonably safe" or "unreasonably dangerous." Dkt. 103, at 12. But an expert does not need to parrot the exact language used in the statute. *See In re Zimmer Nexgen Knee Implant Prod. Liab. Litig.*, 218 F. Supp. 3d 700, 725 (N.D. Ill. 2016), *aff'd sub nom. In re Zimmer, NexGen Knee Implant Prod. Liab. Litig.*, 884 F.3d 746 (7th Cir. 2018) ("Plaintiffs are not required to put forth an expert to say the magic words . . . But Plaintiffs must provide sufficient evidence to allow a jury to reach that conclusion without resorting to speculation") (applying Wisconsin law). A jury could use the evidence in the report to find that the increased danger posed by the K2 helmet's tapering is unreasonable.

K2 also contends that to establish a design defect, plaintiffs must show that the K2 helmet failed the ASTM standards that were in effect at the time of manufacturing. K2 argues that Ziejewski instead tested the K2 helmet according to current ASTM testing procedures. Ziejewski concedes that he used the updated procedures, but he argues that it is more accurate than the old testing standard. Dkt. 124, ¶¶ 22–23. Plaintiffs need to show only that a reasonable alternative design would have eliminated the risk of harm. Ziejewski tested multiple helmets using the same test methods and concluded the K2 helmet failed where alternative designs did not.

The ASTM standards may be relevant, but they are not dispositive. If the ASTM standards were adopted by federal or state law, then K2 would be entitled to a rebuttable presumption that the helmet was not defective. Wis. Stat. § 895.047(3)(c). But the ASTM

standards are only voluntary. Compliance with voluntary standards at the time of manufacturing may be evidence that K2 behaved reasonably, in defense of plaintiffs' negligence claim. *See Michaels v. Mr. Heater, Inc.*, 411 F. Supp. 2d 992, 997 (W.D. Wis. 2006) (citing *Getty Petroleum Marketing, Inc. v. Capital Terminal Co.*, 391 F.3d 312, 326 (1st Cir. 2004)). So, at trial, K2 can raise this defense in response to plaintiffs' negligence claim. But it is only a piece of evidence that the jury may weigh when deciding whether defendants met their duty to exercise reasonable care. *Id.*

### ii. Causation

K2 also contends that it is entitled to summary judgment because the helmet was out of place at the time of impact, so plaintiffs cannot show that any alleged defect caused Scott's injuries. The location of the helmet at the time of the accident is sharply and genuinely disputed, so that theory provides no basis for granting summary judgment to K2.

Nevertheless, K2 contends that even if the helmet was in place, it is still entitled to summary judgment because no helmet could have prevented Scott's injury because preexisting injuries made him particularly vulnerable. This theory provides no basis for granting summary judgment to K2 either.

K2 adduces some evidence that Scott had suffered previous head injuries. Dkt. 144, ¶¶ 45–50. But K2 has scant evidence that the prior injuries were serious ones. More important, K2 does not adduce any evidence to support the outlandish statement in its brief that "no helmet would have been able to prevent the injuries he sustained on December 31, 2015." Dkt. 103, at 10. K2's own proposed findings of fact undermine this idea:

> Had Mr. Rogers not been wearing a helmet, his brain injury would have been at least as severe if not more severe than it was on December 331, 2015, leaving him with worse permanent

residuals or traumatic brain injury, or could have even adversely impacted his survival.

Dkt. 144, ¶ 51. K2 also says that plaintiffs' expert Ziejewski "concedes that an alternative design would not have prevented Mr. Rogers from suffering a traumatic brain injury or a subdural hematoma in the subject incident." Dkt. 103, at 11 (citing Dkt. 144, ¶ 28). As plaintiffs point out, K2 has grossly misstated the substance of Ziejewski's deposition testimony in this proposed fact. Ziejewski testified that a properly designed helmet would have prevented a subdural hematoma, a level 4 injury. Ziejewski acknowledged that even with a properly designed helmet, "mild traumatic brain injury" was still a possible or likely outcome. Dkt. 122, at 28:21–29:25.

### b. Defective Instructions

Plaintiffs' alternative theory is that if the helmet slipped out of place before impact, it slipped because of defective instructions. Under Wisconsin's product liability statute, a product is defective because of inadequate instructions or warnings if "foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe." Wis. Stat. § 895.047(1)(a). Plaintiffs do not need to show that Scott actually read the instructions to prove causation. When a product is missing an adequate warning, the missing warning is a substantial factor in causing injury if a reasonable person would have heeded the warning and as a result avoided injury. *Michaels*, 411 F. Supp. 2d at 1006 (citing *Tanner v. Shoupe*, 228 Wis. 2d 357, 596 N.W.2d 805, 817–18 (Ct. App. 1999)). There is a presumption that any missing instructions would have been read, and therefore a presumption of causation. *Id.*

Throughout its briefing, K2 contends that the looseness of Scott's chinstrap was a factor that caused the helmet to slip out of place. Plaintiffs contend that any mistake by Scott in tightening his chinstrap was caused by the fitting instructions included with the helmet. The helmet's instructions state that the helmet should be snug and that after adjusting the straps and pads, "the skin on your forehead should move with the helmet." Dkt. 145, ¶ 10. The instructions do not include specific directions on the tightness of the chinstrap. A reasonable jury could find that this instruction does not warn consumers that they need to tighten the chinstrap in addition to adjusting the pads and comfort liner.

K2 contends that plaintiffs are required to adduce expert testimony regarding the effectiveness of product warnings. Dkt. 103, at 15. But K2 cites no case in which expert testimony was required to show that a warning was defective. Under Wisconsin law, expert testimony is required only if the court finds that "the underlying issue is not within the realm of the ordinary experience of mankind." *State v. Kandutsch*, 2011 WI 78, ¶ 28, 336 Wis. 2d 478, 799 N.W.2d 865 (internal quotations omitted). And Wisconsin courts have declined to require expert testimony in cases involving much more complex issues than these fitting instructions. *See Lindeman v. Mt. Olympus Enterprises, Inc.*, No. 14-cv-435, 2015 WL 4772925, at *3 (W.D. Wis. Aug. 12, 2015) (collecting cases). Here, the instructions are written in plain language, and the act of reading and following instructions is well within the ordinary experience of mankind.

The court denies K2's motion for summary judgment on the defective instructions claim.

### 3. Negligence claim

Plaintiffs also bring a claim for negligence. To sustain this claim, plaintiffs must prove (1) the existence of a duty of care on the part of the defendant, (2) a breach of that duty of care, (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and (4) actual loss or damage resulting from the injury. *Smaxwell v. Bayard*, 2004 WI 101, ¶ 32, 274 Wis. 2d 278, 682 N.W.2d 923. In Wisconsin, a manufacturer's duty of care includes the duty to safely design the product so it is fit for its intended purpose, and the duty to conduct adequate inspections and tests to determine the extent of defects. Wis. Civil Jury Instructions § 3200(2).

K2 contends that plaintiffs have not adduced evidence of "specific acts of negligence." Dkt. 103, at 17. But plaintiffs can rely on the same evidence used to establish their product liability claims. Although negligence and product liability are alternative theories of liability, there is significant overlap between the two. *See Krien v. Harsco Corp.*, 745 F.3d 313, 317 (7th Cir. 2014) ("[A] claim of strict products liability is much like a negligence claim because it requires proof either that the product was unreasonably dangerous or, what amounts to the same thing, that it was defective"). Plaintiffs' expert testimony from Ziejewski is sufficient to create a material dispute regarding whether K2 breached its duty to design a product that was safe for skiers.

### 4. Breach of warranty claim

K2 moves for summary judgment on plaintiffs' claims for breach of warranty on two grounds. Dkt. 103, at 17–18. First, K2 contends that under *Austin v. Ford Motor Co.*, claims for breach of warranty cannot be brought when the plaintiff has a tort claim. *See* 86 Wis.2d 628, 273 N.W.2d 233, 240 (1979) ("[I]t is inappropriate to bring an action for breach of warranty

where a tort remedy is sought"). Second, K2 contends that there is no privity of contract between plaintiffs and K2. *See St. Paul Mercury Ins. Co. v. Viking Corp.*, 539 F.3d 623, 626 (7th Cir. 2008) (Wisconsin law requires privity of contract between parties before liability can be founded on breach of express or implied warranty).

Plaintiffs have not substantively responded to either of these arguments. Dkt. 137, at 52–53. Failure to respond to an argument can result in waiver or forfeit of a claim. *Nichols v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 509 F. Supp. 2d 752, 760 (W.D. Wis. 2007) (collecting cases). Because plaintiffs did not respond to K2's arguments regarding privity or the ability to bring warranty claims in a tort case, the court will grant summary judgment for K2 on plaintiffs' claims for breach of warranty.

### 5. Loss of consortium claim

K2 moves for summary judgment on Tracy's loss of consortium claim because it is derivative of Scott's injuries. Because the court denies summary judgment on Scott's product liability and negligence claims, it will also deny summary judgment on Tracy's claim for loss of consortium.

K2 also moves to dismiss Tracy's claim on the ground that plaintiffs have not properly pleaded loss of consortium in their amended complaint. Plaintiffs' amended complaint does not include "loss of consortium" as an independent cause of action, but it does include allegations that "Plaintiff Tracy Rogers . . . has been deprived of the services, society, companionship and consortium of Scott Rogers as a proximate result of his enhanced injuries." Dkt. 32, ¶ 23. K2 contends that this is insufficient under the plausible pleading standard of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Plaintiffs' allegations are sufficient to state a claim. Even post-*Iqbal*, Federal Rule of Civil Procedure 8 requires only "adequate notice of the scope of, and basis for" the asserted claims. *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 783 (7th Cir. 2015) (citing *Vincent v. City Colleges of Chi.*, 485 F.3d 919, 923 (7th Cir.2007)). Here, K2 had adequate notice that Tracy was seeking relief for loss of consortium as a result of the enhanced injuries caused by the K2 helmet.

## C. Additional motions and requests for relief

As a final matter, plaintiffs ask the court to deny certain requests by K2 that plaintiffs contend were improperly included in K2's summary judgment reply. Dkt. 149. Some of the "motions" to which plaintiffs refer are objections to allegedly inadmissible evidence—objections that K2 is allowed to raise during summary judgment. For example, K2 objects that the declarations from Tracy and Ziejewski, first produced with plaintiffs' summary judgment opposition, are untimely expert testimony. Dkt. 143, at 3–10. There is nothing improper about K2 making these objections in its summary judgment reply. (The court has overruled the objection to Tracy's declaration, and it has not considered the Ziejewski declaration. Whether the Ziejewski evidence will be allowed at trial will be addressed later at the final pretrial conference.)

But K2 requests two additional forms of relief in its reply brief. First, K2 contends that plaintiffs should be sanctioned for spoliation because Tracy adjusted the helmet's comfort liner and therefore altered it from its condition at the time of the accident. Dkt. 143, at 7–8 fn. 7. Second, K2 contends that plaintiffs did not disclose the existence of Scott's ski goggles and must be ordered to turn them over. *Id.* at 8.

A party may not raise new issues in a reply brief. *See Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). In any event, both of K2's requests for additional relief are undeveloped. The spoliation arguments are relegated to a footnote. And both requests misconstrue the history of this case. K2's own experts previously removed the helmet's comfort lining at issue. Dkt. 112, at 10–11. And K2 was already aware of Scott's goggles, Dkt. 130 (Tracy dep. 33:9–17), and Halstead included a pair of goggles as a factor in his testing. Dkt. 110, at 4. The court will deny K2's requests for additional relief, thus granting plaintiffs' request.

## ORDER

IT IS ORDERED that:

1. Plaintiffs motion to exclude the opinion testimony of K2's experts, Dkt. 139, is GRANTED in part and DENIED in part, as provided in this opinion.

2. Defendant K2's motion for summary judgment, Dkt. 102, IS DENIED for the most part. The motion is GRANTED only with respect to plaintiffs' claims for breach of warranty.

3. Plaintiffs Scott Rogers and Tracy Rogers' motion, Dkt. 149, for summary denial of K2's motions is GRANTED in part. The court denies defendant K2's motions to produce ski goggles and to sanction plaintiffs for spoliation.

4. Pursuant to the parties' stipulation, Dkt. 250, all claims as to defendants Lexington Insurance Company and AIG Europe Limited are DISMISSED without prejudice.

Entered December 28, 2018.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge